## A03A2052. MIXON v. GEORGIA CENTRAL RAILWAY, L.P.
(596 SE2d 807)

PHIPPS, Judge.

Michael Mixon sustained severe injuries during the unloading of a truck at Global Commodities, Inc., his place of employment. Mixon appeals the grant of summary judgment to Georgia Central Railway, L.P. in his premises liability action. Because we find no error, we affirm.

At summary judgment, when the record reflects an absence of evidence sufficient to create a genuine issue as to any essential element of a plaintiff's claim, that claim tumbles like a house of cards, rendering all other disputes of fact immaterial.[1] This is such a case. When viewed in the light most favorable to Mixon, the evidence shows that Mixon, while working in the truck delivery area outside Global's facility, was seriously injured when the covering above an auger pit suddenly gave way. Ordinarily, a solid, steel plate covered the opening to a shallow underground tunnel-like area containing a large screw-type auger. This large auger pushed materials, such as grain, underneath a railroad sidetrack and onto a conveyor belt which would then lift the material into Global's building. When truck deliveries were underway, workers would remove the solid, steel plate, thereby leaving only an iron grate, a grid comprised of rebar, to cover the pit and the auger during the unloading process. Mixon explained that the reason for removing the steel plate during a delivery is "so you could check the flow of the product, make sure there is not too much in the auger." The solid plate, that remained on top of the iron grate except during deliveries, served the dual purposes of keeping out rainwater and safeguarding people from inadvertently stepping into the pit.

The incident occurred as a truck was beginning to empty its load into the pit. As Mixon was standing to the rear of the truck and next to the grate, the driver asked Mixon whether it was okay to open the hopper door under his truck and Mixon told him, "yes." Mixon testified that "[the truck driver] started opening the door and I stepped back to get out of his way, and when I stepped back, I felt my right foot get caught on the railroad track and I started to fall." When the welds on the rebar grate apparently failed, a section of the grate speared Mixon in his upper thigh and his right foot slipped down into the pit where it became mangled in the machinery. Unable to extricate himself, Mixon had to direct the truck driver to the location of the

---

[1] *Wilson v. City of Sardis*, 264 Ga. App. 178 (590 SE2d 383) (2003).

switch to cut off the main power. As a result of being caught in the auger, Mixon's right leg had to be amputated below the knee.

Mixon testified that the grating was supposed to be secure and surmised that the grate's "tack welding" did not hold. Mixon testified that the grate was "[l]ightly welded, just enough to hold it in place." Mixon theorized that "the grating, because it was improperly welded to the frame that it sat in, flipped up and allowed [him] to fall into the second open auger pit."

At the time of the incident, Mixon was working for Global, which was leasing Mixon's services from Certified Systems, Inc. Mixon received workers' compensation benefits from Certified Systems and later entered into a stipulated settlement with Certified Systems. Mixon filed suit against Georgia Central, Global, Thomas Conveyor Company, the manufacturer of the conveyor system, Roemer-Fornazor Company, the designer of the system and component parts, and Norden Group, the property owner.[2] After Mixon entered into settlement agreements with Roemer-Fornazor, Thomas Conveyor, and Norden Group, only Georgia Central remained as a defendant.[3]

Less than a year before this incident, Georgia Central and Global had executed a "Private Sidetrack Agreement." This agreement authorized "the construction, maintenance and use of a private Sidetrack for the tender and receipt of rail freight traffic for the account of [Global]." Section 4.1 of the agreement required that:

> [Georgia Central] and [Global], at their own expense, shall inspect, maintain and renew their respective Segments of the Sidetrack: (A) in accordance with the Federal Railroad Administration Track Safety Standards and (B) in a safe condition, consistent with the operating circumstances and amount of use. . . . [Georgia Central] shall have the right, but not the duty, to inspect [Global's] Segment.

Under the agreement, Global was responsible for the inspection, maintenance, and upkeep of its segment of sidetrack. Global designed, built, and installed the auger pit as well as the grate and solid metal cover for that pit. Doug Davis, the vice president and chief engineer of Rail Management Corporation, testified without contradiction that the segment of sidetrack above the auger pit was designated as Global's property. Thus, Global, not Georgia Central, was responsible for the segment of sidetrack above the auger pit.

---

[2] Global was leasing the premises from Norden Group.

[3] Global claimed that subsection (c) of OCGA § 34-9-11 barred Mixon's claims against it. Mixon filed a voluntary dismissal without prejudice of his claims against Global.

Notwithstanding the contractual provision in the sidetrack agreement requiring Global to inspect and maintain its portion of sidetrack, Mixon sought to hold Georgia Central liable for that segment of track under a negligent inspection theory. Mixon alleged that the "sidetrack, conveyor auger and auger cover grating had been inspected by Defendant Georgia Central Railway prior to Plaintiff's injury." He asserted that Georgia Central had negligently inspected the sidetrack and auger, permitted a dangerous condition to exist on its right-of-way, and failed to give adequate warning about that condition.

In granting summary judgment, the trial court found that

it is an undisputed fact that the auger pit where Mixon, a Global Commodities employee, was injured was built by Global Commodities and its contractors. Only Global Commodities had the duty to inspect and maintain the auger pit for the safety of its employees. Georgia Central Railway had no such duty.

1. Mixon contends that "in voluntarily undertaking to inspect its tracks, Georgia Central Railway took on the 'Good Samaritan' duty set forth in Restatement (Second) of Torts 324A as adopted in Georgia." He claims that the trial court overlooked the fact that after undertaking that duty, the railroad failed to exercise reasonable care in performing that duty. Under this principle,

[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person [under] the undertaking.[4]

Stated another way, when one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with reasonable care.[5]

---

[4] (Citations and punctuation omitted.) *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588, 589 (322 SE2d 269) (1984).

[5] *Stelts v. Epperson*, 201 Ga. App. 405, 407 (411 SE2d 281) (1991).

But Mixon failed to offer evidence that for his protection, Georgia Central had voluntarily undertaken an inspection of the grate on which he fell. Nor did he offer evidence that he reasonably relied upon the performance of that inspection. On the contrary, as discussed more fully below, the record refutes this claim.

Global's plant manager, George Gabettie, testified that in 1999, Global installed the auger system to facilitate deliveries of products used in the packaging of animal feed and fertilizer for export. As Gabettie recounted in his affidavit, "The auger conveyor system in the lawsuit is located in a pit. My employer, Global Commodities, Inc., ordered steel rebar, which was cut and welded from rods on site, by Global Commodities' employees to make a custom-fitted metal grate over the pit." Gabettie explained that the purpose of the sidetrack was to "unload rail cars, hopper bottom rail cars." Notwithstanding Global's capability for unloading hopper bottom rail cars, according to Gabettie, all deliveries to date had been from hopper bottom trucks. Gabettie testified that Danny Moncus, an employee of Georgia Central, had briefly examined the auger system under the sidetrack, "[j]ust to make sure that it didn't hinder their rail cars." He testified that only he and Moncus were present for this inspection, which lasted less than an hour. As Gabettie recalled, "We just wanted to make sure that the track was clear."

Moncus, the roadmaster responsible for that area of track, testified that his job was to ensure that the track complies with Federal Railroad Administration standards and is maintained in a safe condition for trains to pass over. Moncus, the only employee of Georgia Central to inspect the sidetrack, testified that he could recall walking along that area only once. Moncus testified that "I walked the track one time, I believe. They asked for an inspection of the track so that the contractors could get their money . . . that it was safe to spot cars on." Moncus explained that his purpose in walking the track was to determine clearances. Moncus also testified that at this location and at similar facilities, he did not pay much attention to grates, auger pits, or the unloading process for hopper cars. Moncus added, "All I know about it is whether the track, you know, is safe. I don't know anything about a pit and an auger." Moncus also testified that when he operates a track inspection truck and inspects switches, he stays on the main line and never drives on sidetracks.

In contravention to the tenor of this testimony, Mixon asserts in his appellate brief that "Georgia Central Railway did have knowledge of the defective condition of the grating since it inspected the grating when it inspected the sidetrack." Mixon claims that "Mr. Moncus not only inspected the track containing the auger at Global Commodities, he even wrote a letter stating that he had inspected the track, and

recommended certain safety measures be implemented based on what he saw during his inspection."

But, Moncus's letter of July 6, 1999, directed to Pave-Tec, Inc., discussed only the railroad crossings and clearances. In the letter at issue, Moncus wrote, "This track will be okay to spot cars as soon as the following items are taken care of by your company." Moncus then informed Pave-Tec's quality control officer that "two (2) cross buck signs" needed to be installed as well as a caution sign stating "Warning — Close Clearance Do Not Ride Side Or Top Of Car." Moncus gave specific directions to Pave-Tec for the placement of these signs. This letter makes no mention at all of Global's grate, auger, or conveyor system.

Inspecting Global's segment of sidetrack for rail car clearances or for railroad crossing signage is not the same as inspecting it for dangers to pedestrians. By Mixon's own account, while stepping backward, he tripped and fell on an improperly constructed grate with defective welding. Under Mixon's theory, one supported by his expert's testimony, the grate had been improperly designed and constructed, resulting in its failure to safeguard the entrance to the screw conveyor when Mixon stepped on the grate.[6] Mixon's expert testified that the grate or guard was "a homemade, shop-made hunk of rebar that [was] put in place and subsequently fail[ed]." Mixon's expert testified that the grate did not meet industry standards and was defective because the grate was not heavy enough to stay in place, had exposed ends, used excessive spacing, and was not bolted in place.

Although the record plainly contains evidence that this particular grate was, in fact, defective, the record is devoid of evidence showing that for Mixon's benefit, Georgia Central had voluntarily undertaken an inspection of that grate and that Mixon had reasonably relied upon that inspection. Thus, this theory of liability must fail as a matter of law.[7]

2. Mixon also asserts that as the premises owner, Georgia Central owed a duty to exercise reasonable care to protect him because the owner of premises has a nondelegable duty to keep his premises safe for the protection of invitees.[8] Under this nondelegable duty, an owner or occupier "must use ordinary care to guard, cover, or

---

[6] Kenneth Blundell, Ph.D., testified that, in his view, the "defective grating was discoverable by professional inspection personnel upon a reasonable inspection of the grating and the structure on which it was affixed."

[7] See generally *Community Fed. S & L Assn. v. Foster Developers*, 179 Ga. App. 861, 865 (3) (348 SE2d 326) (1986) (liability can arise from a negligent inspection undertaken voluntarily).

[8] See *Towles v. Cox*, 181 Ga. App. 194, 196 (1) (351 SE2d 718) (1986).

protect the dangerous or defective portion of the premises."[9] Mixon contends that because "the defective grating was discoverable upon reasonable inspection," Georgia Central should have discovered the defective condition during its inspection of the sidetrack. Mixon argues that the presence of the "dangerous, defective auger on Georgia Central Railway's property" was a breach of its nondelegable duty.

Georgia Central neither owned nor occupied the segment of sidetrack where Mixon was injured. Even assuming for the sake of argument only that a dangerous condition existed on Georgia Central's right-of-way and further assuming arguendo that Georgia Central owed a nondelegable duty to Mixon as to that right-of-way, the record fails to show that the railroad had any knowledge of the defective or dangerous condition that apparently was the result of Global's use of a defective iron grate below the steel plate.

The exercise of ordinary diligence does not require the use of extraordinary inspection measures.[10] A property owner breaches no duty if ordinary care would not have revealed the dangerous condition.[11] Here, Mixon concedes in his appellate brief that "the dangerousness of the grating was not readily apparent until after the grating dislodged from its frame and allowed the Plaintiff to fall into the auger pit." Mixon also admits in his brief that: "[n]or was the grating an open and obvious danger." Moreover, Global's plant manager testified without dispute that when he stepped on the same grate, he discerned nothing of significance, meaning there was no mishap.

In light of Mixon's concession that the "dangerousness of the grating was not readily apparent until after the grating dislodged from its frame," and his admission that the condition of the grating was not an open and obvious danger, Mixon failed to show that even had Georgia Central undertaken to perform a reasonable inspection, it would have discovered the dangerousness of the grate.[12] Under these facts, the trial court properly granted summary judgment to Georgia Central.

3. In the absence of evidence that Georgia Central owed any duty to Mixon that was breached, we need not address Mixon's additional

---

[9] (Citation, punctuation and emphasis omitted.) Id. at 197.

[10] *Pulliam v. Southern Regional Med. Center*, 241 Ga. App. 285, 287 (1) (526 SE2d 573) (1999).

[11] *Rhodes v. B. C. Moore & Sons, Inc.*, 153 Ga. App. 106, 107 (1) (264 SE2d 500) (1980).

[12] See *Ballard v. Southern Regional Med. Center*, 216 Ga. App. 96, 98 (1) (453 SE2d 123) (1995) (plaintiff must demonstrate that the defective condition was discoverable upon a reasonable inspection).

arguments relating to superior knowledge, contributory negligence, and assumption of the risk.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED MARCH 18, 2004.

Savage, Turner & Pinson, Robert S. Kraeuter, Christopher D. Britt, for appellant.

Dillard, Bower & Crowley, Terry A. Dillard, Scott C. Crowley, for appellee.